ABERDEEN FARMERS' EQUITY EXCHANGE, Respondent,
v. SAND, et al, Appellants.

(221 N. W. 597.)

(File No. 6355.   Opinion filed October 17, 1928.)

*McNulty, Williamson & Smith,* of Aberdeen, for Appellant.
*Van Slyke & Agor,* of Aberdeen, for Respondent.

MISER, C. Respondent alleged in its complaint that appellant Sand, as manager of respondent's elevator, was authorized to buy and sell grain for future delivery in such amounts as would be required to protect respondent from loss on account of variation of price of grain which had been stored in respondent's elevator, shipped on the market by respondent, and not replaced by a like amount of grain bought and delivered at the elevator; that, on November 17, 1919, pursuant to his duty so to do, Sand bought for respondent, through the Davies Company, a commission firm, co-defendant and appellant, 7,000 bushels of May rye at $1.39⅞ per bushel; that on January 14, 1920, said rye was sold by Davies Company at $1.73 per bushel; but that, pursuant to a conspiracy between Sand and the commission firm, the profit on only 4,000 bushels was credited to respondent and the profit on 3,000 was credited to Sand; that likewise, on January 26, 1920, Sand bought

for respondent, through Davies Company, 2,000 bushels of May rye at $1.65, and sold on April 3, 1920, at $1.80¾, the profit on which, pursuant to a like conspiracy, was credited to Sand—all to respondent's damage in the sum of.$1,291.65.

Sand testified that, on November 17, 1919, when the 7,000 bushels of May rye were bought, respondent needed 4,000 bushels as a hedge, and therefore he bought that amount for respondent and made an entry on respondent's books to that effect, and that the additional 3,000 bushels of May rye were bought for himself; that, on January 26, 1920, when 2,000 bushels of May rye were purchased, no part of it was needed by respondent as a hedge, and that it was all bought for himself; that neither he nor respondent paid for same or put up any margins thereon, but it was carried on open account with the commission firm, and, when sold by it, he was entitled to the profits.

█ Errors 12-16 assigned relate to the sufficiency of the evidence. Without here stating the evidence more fully, it may be fairly said that the question whether said purchases were the personal transactions of Sand or were made by him for respondent was a difficult question of fact on which the evidence was conflicting, and which it was the special province of the jury to determine, and that there is sufficient evidence to sustain the verdict for respondent. The most serious questions presented by this appeal are as to whether the issues were fairly presented to the jury. These relate to rulings on the admission or exclusion of evidence and the instructions to the jury.

█ Errors 1-4 assigned relate to the overruling of objections made by appellants to questions as to the time when respondent's directors first became advised of the facts on which the suit was based. Inasmuch as the action was not brought until 4½ years after the transaction took place, it was not error to have the evidence show the jury the reasons for the delay, even though such evidence was otherwise irrelevant and immaterial. Errors 5 and 6 assigned relate to exclusion of evidence offered on behalf of appellant as to when the bookkeeper of respondent was first advised that Sand was buying futures on his own account. Appellant's witness later testified as to the time. There was therefore no prejudice in the error complained of. Errors 7-11 assigned relate to the admission of evidence as to two purchases of July rye on

April 26, 1920, of 1,000 bushels each, and the subsequent sale of 2,000 bushels of July rye at a loss of $200. The purchases testified to were shown on the books of the commission firm in the name of Sand; the sale at a loss was in the name of the Equity Exchange. The evidence was not conclusive that the loss on the 2,000 bushels purchased for Sand was shifted to the Equity Exchange, but it was enough to call for an explanation. In view of prior testimony relating to alterations in the firm's record of the transactions of November 17th and January 26th, which its president claimed were corrections of original bookkeeping errors and which respondent contends is evidence of a scheme to defraud, and in view of the fact that conspiracy between the commission firm and the manager of the elevator was alleged, the court is of the opinion that this did not constitute error.

Errors 18-24 assigned relate to the instructions to the jury. The most serious of the questions raised on this appeal are presented by appellant's exceptions to the following instruction:

"The court further instructs the jury that the two principal questions for the jury to determine in this action are: "Was the procuring, making, and taking of what is known as 'hedges' procured and made as a transaction for plaintiff company, or was it not? The other question is, Did the defendants conspire together and fraudulently, wrongfully, and unlawfully sell any or all of the grain in question, or appropriate any of said grain or the proceeds thereof to the use and benefit of defendant H. H. Sand? * * * The court further instructs the jury that, if you find from a preponderance of all the evidence in this case that, on or about the times claimed by plaintiff, that the 'hedges' were made as a transaction for plaintiff company, and that defendants conspired together and fraudulently, wrongfully, and unlawfully sold any or all of the grain in question to H. H. Sand or appropriated and converted any of said grain or the proceeds thereof to the use and benefit of the defendant H. H. Sand, then and in that instance your verdict should be for the plaintiff company, for the value of all grains so appropriated and converted."

As appellant well contends, the trial court might better and more simply have stated the first of the principal questions to be submitted to the jury as follows: Instead of saying, "Was the procuring, making, and taking of what is known as 'hedges' procured

and made as a transaction for plaintiff company or was it not?" the court should have said, "Were the 3,000 bushels of rye bought on November 17, 1919, and the 2,000 bushels of rye bought on January 26, 1920, the personal transactions of the defendant Sand or the transactions of the plaintiff elevator company?" Although appellant presented no such requested instruction, its failure to do so should not excuse the giving of an erroneous instruction, if prejudicial.

The word "hedges" used in the instruction has a well-defined technical meaning. 27 C. J. 992; Miller Co. v. Klovstad, 14 N. D. 435, 105 N. W. 164; Browne v. Thorn, 260 U. S. 137, 43 S. Ct. 36, 67 L. Ed. 171. If the entire 7,000 bushels of May rye bought by Sand on November 17, 1919, were bought by him for his employer, to protect it from loss due to fluctuations in price, the entire transaction was a "hedge." If only 4,000 bushels of the entire 7,000 bushels were bought to protect the company, and the remaining 3,000 bushels were bought for himself, the purchase of the 3,000 bushels was not a "hedge" but a personal speculation. However, the purchase of the 4,000 bushels would remain a "hedge." In either event, whether his design was entirely protective of his employer or in part personally speculative, the transaction would be a transaction in futures. It is far from certain that the trial judge, in his loose use of the word "hedges," did not intend to convey that meaning, nor that the jury did not so understand it. Although, unquestionably, it would have been better to have framed the question as suggested by appellants' exception to the instruction, thereby avoiding the use of a word not defined in the instructions nor part of the average juror's vocabulary, the instruction complained of conveyed to the jury the same idea which would have been conveyed by the more exact language suggested by appellants' exception to the instruction, unless the word "hedges" was understood in its technical sense; and, while the word "hedge" had ordinarily been used in its legal significance in the testimony, Sand himself, testifying as to the purchase of the 3,000 bushels of May rye on November 17, 1919, said that he put up the "hedge" on the market for that 3,000 bushels of rye.

But assuming that the word was used in its technical sense, and was so understood by the jury, the evidence is conclusive that all hedges made were made for plaintiff company, respondent

herein. The answer of the jury to the first question presented by the instruction must therefore have been in the affirmative. But the instructions as a whole required the jury to also answer in the affirmative the second question before it could arrive at the verdict which it did arrive at. The verdict of the jury conclusively shows that the jury must have answered the second question in the affirmative; and the evidence, although conflicting, is amply sufficient to sustain such an affirmative answer to the second question. The asking of the first question, which, if the word "hedge" be given its technical significance, could, under the evidence, have only been answered in the affirmative, could not affect the result if the jury answered the second question in the affirmative. Such being the case, the court is of the opinion that the use of the word "hedges" in the instruction, although not to be commended, was not prejudicial to the rights of appellants.

The judgment and order appealed from are affirmed.

BURCH, P. J., and POLLEY, SHERWOOD, and BROWN, JJ., concur.

CAMPBELL, J., disqualified and not sitting.